# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 00-3966

| | | |
|---|---|---|
| LUCYNDA S. WORMS, | * | |
| | * | |
| Petitioner, | * | Petition for Review of an Order |
| | * | of the Railroad Retirement Board |
| v. | * | |
| | * | [PUBLISHED] |
| | * | |
| RAILROAD RETIREMENT | * | |
| BOARD, | * | |
| | * | |
| Respondent. | * | |
| | * | |

Submitted: June 11, 2001
Filed: July 5, 2001

Before WOLLMAN, Chief Judge, HAMILTON[1] and MURPHY, Circuit Judges.

HAMILTON, Circuit Judge.

Lucynda Worms (Worms) seeks review of a final decision by the Railroad Retirement Board (Board), affirming and adopting the decision of the Board's hearing officer, denying Worms' request for waiver of recovery of a $38,105.71 overpayment

---

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

of surviving young mother annuity benefits paid to her under the Railroad Retirement Act. 45 U.S.C. § 231a(d)(1)(ii) & 231i(c). For reasons that follow, we affirm.

I

On October 15, 1992, Worms' husband and railroad employee, Jeffrey Worms, died in a work-related accident. At the time of Jeffrey Worms' death, Christopher Worms (Christopher), Jeffrey Worms' then thirteen year-old son from a previous marriage, resided with the couple. On October 23, 1992, Worms applied for annuity benefits under the Railroad Retirement Act, 45 U.S.C. § 231a(d)(1)(ii), in her capacity as the surviving young step-mother and caretaker of Christopher Worms.[2] At the time Worms applied for Surviving Young Mother Annuity Benefits, she received "Form RB-18," an official Board publication, which, <u>inter alia</u>, outlines the rights and obligations of recipients of Surviving Young Mother Annuity Benefits.

Notably, Form RB-18 informed Worms that in order to qualify for Surviving Young Mother Annuity Benefits, she must have "in [her] care any of the children who are entitled to a child's annuity, except a full-time student." (J.A. 47). Form RB-18 further explained that a child under age eighteen or a child age eighteen or older, who is disabled or mentally incompetent, is considered to be in the applicant's care if the applicant exercises parental control and responsibility for the child. Additionally, Form RB-18 unequivocally stated that the applicant must notify the Board immediately if any child leaves his or her care or if the applicant is no longer responsible for the welfare of the child. The record contains a certification by Worms, dated the same day she applied for Surviving Young Mother Annuity Benefits, in which she acknowledged that she received Form RB-18 and agreed that, if any child for whom she receives benefits dies, marries, or leaves her care, she would notify the Board immediately.

---

[2]From this point forward, we will refer to the annuity benefits sought and received by Worms as "Surviving Young Mother Annuity Benefits."

Based on her application, Worms began receiving Surviving Young Mother Annuity Benefits effective October 1, 1992. On May 16, 1995, Worms, through her attorney, wrote the Omaha, Nebraska office of the Board in order to notify the Board that Christopher now resided both (but in different residences) with her and with his paternal grandparents. The Board took no action upon receipt of this information.

On June 25, 1996, Christopher's paternal grandfather, John Worms (Grandfather Worms), filed a completed application with the Board to be named as payee for the annuity benefits that Christopher received under the Railroad Retirement Act pursuant to 45 U.S.C. § 231a(d)(1)(iii). In the application, Grandfather Worms stated that he had been appointed as Christopher's legal guardian and conservator in December 1992[3]; Christopher had lived most of the time since his father's death with him and his wife, Christopher's paternal grandmother; and Christopher had moved in full-time with him and his wife in June 1993. With respect to Worms, Grandfather Worms stated the following:

> Chris has very little contact with his stepmother. He will occasionally go to her house to see her sons when the sons are visiting her. My wife and I make all decisions regarding Chris' activities, schooling, physical needs, and discipline. Lucynda is not consulted in any way.

(J.A. 64). The signature page of the application for substitution of payee stated that by signing the application, the applicant understood that civil and criminal penalties may be imposed on the applicant for false or fraudulent statements or for withholding information to misrepresent a fact material to determining a right to payment under the Railroad Retirement Act.

Based on the application for substitution of payee submitted by Grandfather Worms, the Board terminated Worms' Surviving Young Mother Annuity Benefits

---

[3]He also attached proof of guardianship and conservatorship.

effective July 1, 1996, and sought recovery of benefits paid her between June 1, 1993 and July 1, 1996 on the basis that Worms did not qualify to receive benefits after June 1, 1993. In a letter to the Board dated December 4, 1996, Worms took issue with the Board's attempt to recover the benefits paid her for the June 1, 1993 to July 1, 1996 time period. According to Worms, she qualified to receive those benefits because she exercised some degree of parental control over Christopher during such time period, and Christopher intermittently resided with her during the same time period. She admitted, however, that over the course of the June 1, 1993 to July 1, 1996 time period, Christopher spent more and more time with his grandparents and "transitioned through to the point wherein [sic] the Spring and Summer of 1996 the greater majority of responsibility rested with the grandparents." (J.A. 57). In contrast to Worms' version of events, in a letter dated December 13, 1996, Grandfather Worms reiterated that since June 1993, Christopher had resided with him and his wife, with the couple assuming complete responsibility for Christopher's care and welfare.

On January 21, 1997, the Board's Director of Operations informed Worms that because Christopher had left her care in June 1993, she had received $35,186.83 in overpayment of benefits,[4] which she must repay unless she obtained a waiver of her obligation to repay the overpayment. Worms sought review of the determination that she had been overpaid and requested waiver of recovery of the overpayment pursuant to 45 U.S.C. § 231i(c), if she was in fact overpaid.

In a letter dated July 11, 1997, the Reconsideration Section of the Board notified Worms that its review confirmed the overpayment. In a letter dated August 19, 1997, the Board's Debt Recovery Division notified Worms of its decision that she could not be considered to be without fault in causing the overpayment made to her as she had failed to notify the Board of a change in circumstances that she knew or should have known must be reported to the Board. Specifically, Worms should have reported the

---

[4]The Board later corrected this amount to $38,105.71.

appointment of Grandfather Worms as Christopher's guardian and conservator in December 1992, and the fact that Christopher began residing full-time with his paternal grandparents in June 1993.

On October 21, 1997, Worms appealed the decision to deny her waiver of recovery of overpayment to the Board's Bureau of Hearings and Appeals. A telephone hearing on her appeal was held on May 19, 1999. During the hearing, Worms admitted under oath that she received Form RB-18 specifying that she had an obligation to notify the Board of any change in circumstances that may affect her eligibility to receive Surviving Young Mother Annuity Benefits. She directly disputed, however, Grandfather Worms' statements to the Board that during the June 1, 1993 to July 1, 1996 time period, he and his wife made all decisions regarding Christopher's care and welfare without consulting her. She testified that she was always aware of the nature of Christopher's school activities, spent a lot of time with him discussing school items, and participated in some decisions concerning Christopher, such as which high school he would attend and the type of car he should drive. She also testified that Christopher did not begin residing full-time with his grandparents until around January 1, 1994. With respect to why she did not notify the Board of Grandfather Worms' guardianship and conservatorship of Christopher, Worms explained that she did not give such notice because she was still giving Christopher parental advice at the time of the appointment. With respect to why she did not notify the Board in January 1994 that, according to her, Christopher began residing full-time with his grandparents around January 1, 1994, she explained that the did not give the Board such notice because she was "still advising him on things." (J.A. 138).

On June 25, 1999, the hearing officer issued a decision fully adverse to Worms, finding: (1) effective June 1993, Christopher was no longer in Worms' care and, therefore, Worms was no longer entitled to Surviving Young Mother Annuity Benefits; (2) the Board overpaid Worms in the amount of $38,105.71; (3) Worms may not be

considered without fault in causing the overpayment; and (4) recovery of the overpayment may be processed.

Worms appealed the hearing officer's decision to the Board. On December 13, 1999, the Board affirmed and adopted the hearing officer's decision. Before this court, Worms seeks review of the final decision of the Board. 45 U.S.C. § 231g.

II

Our review of the Board's decision affirming the hearing officer's decision to deny Worms' request for a waiver of recovery of overpayment is confined to determining whether the Board's decision is supported by substantial evidence, is not arbitrary, and has a reasonable basis in law. Williams v. Railroad Retirement Bd., 585 F.2d 341, 343 (8th Cir. 1978). In reviewing the Board's decision, evidence both supporting and detracting from the Board's decision will be considered, but the decision will not be reversed simply because substantial evidence may support the opposite conclusion. Timberton v. Railroad Retirement Bd., 108 F.3d 189, 193 (8th Cir. 1997).

Under the Railroad Retirement Act, the Board is authorized to recover an overpayment of Surviving Young Mother Annuity Benefits. 45 U.S.C. § 231i(a). However, the Board may waive such recovery when certain requirements are met. 45 U.S.C. § 231i(c). Waiver of the recovery of overpayment is appropriate when, in the judgment of the Board, the overpaid individual is without fault in having caused the overpayment to occur and recovery either will be contrary to the purpose of the Railroad Retirement Act or against equity or good conscience. 45 U.S.C. § 231i(c). Board Regulation § 255.11 defines fault as a "defective judgment or conduct arising from inattention or bad faith." 20 C.F.R. § 255.11(b). The Regulation further provides that "judgment or conduct is defective when it deviates from a standard of reasonable care taken to comply with the entitlement provisions of this chapter." Id. The Regulation provides that conduct includes both action and inaction, and unlike fraud,

fault does not require a deliberate intent to deceive. Id. Board Regulation § 255.11 further provides, in relevant part:

(c) Whether an individual is at fault in causing an overpayment generally depends on all circumstances surrounding the overpayment. Among the factors the Board will consider are: the ability of the overpaid individual to understand the reporting requirements of the Railroad Retirement Act or to realize that he or she is being overpaid (e.g., age, education, comprehension, physical and mental condition); the particular cause of non-entitlement to benefits; and the number of instances in which the individual may have made erroneous statements.

(d)(1) Circumstances in which the Board will find an individual at fault include but are not limited to:

(i) Failure to furnish to the Railroad Retirement Board information which the individual knew or should have known to be material;

(ii) An incorrect statement made by the individual which he or she knew or should have known was incorrect (including furnishing an opinion or conclusion when asked for facts); and

(iii) Failure to return a payment which the individual knew or should have known was incorrect.

(2) Where any of the circumstances listed in paragraph (d)(1) are found to have occurred, the individual shall be presumed to be not without fault. This presumption may be rebutted, but the burden of presenting evidence to rebut the presumption is on the individual.

20 C.F.R. § 255.11(c)-(d).

The sole issue presented by Worms is whether substantial evidence in the record, when considered as a whole, supports the Board's decision that Worms was not

without fault in being overpaid $38,105.71 in Surviving Young Mother Annuity Benefits for the time period June 1, 1993 to July 1, 1996. We resolve this issue in favor of the Board.

First, Worms does not dispute, nor could she, the Board's finding that she knew of her obligation to notify the Board if Christopher ever left her care. Upon application for Surviving Young Mother Annuity Benefits on October 23, 1992, Worms received Form RB-18 which informed Worms of her continuing obligation to notify the Board of any change in circumstances that may affect her eligibility to receive benefits. Form RB-18 also explained that in order to remain eligible to receive Surviving Young Mother Annuity Benefits, Worms must have the child for whom her application for benefits was based "in [her] care," with "in [her] care" defined as "exercis[ing] parental control and responsibility for the child." (J.A. 49).

Second, substantial evidence in the record supports the Board's finding that as of June 1993, Christopher was no longer in Worms' care. In this regard, the record shows that Grandfather Worms became Christopher's legal guardian and conservator in December 1992. The record also contains numerous statements by Grandfather Worms to the effect that, as of June 1993, Christopher was totally in the care of him and his wife, including residing with them full-time. Many of these statements were made under the express threat of civil and criminal prosecution if the statements were false, fraudulent, or materially inadequate with respect to determining a right to payment under the Railroad Retirement Act.

Worms argues that because Grandfather Worms did not make any statements upon which the Board relied under oath, the Board could not rely upon those statements in denying her request for waiver of recovery of overpayment. This argument is without merit. In resolving a challenge to such a denial, the Board is not bound by the technical rules of evidence. 20 C.F.R. § 260.5(f) (technical rules of evidence do not apply at hearings before the Board's hearing officer). Rather, the Board is free to credit

unsworn testimony, as long as in doing so it "protect[s] the record against scandal, impertinence, and irrelevancies . . . ." Id. Here, such protection is evidenced by the fact that Grandfather Worms made many of his statements relied upon by the Board under the express threat of civil and criminal prosecution if his statements were false, fraudulent, or materially inadequate with respect to determining a right to payment under the Railroad Retirement Act.

Because substantial evidence supports the Board's findings that Worms knew of her obligation to notify the Board if Christopher ever left her care and that as of June 1993, Christopher was no longer in Worms' care for purposes of her eligibility to receive Surviving Young Mother Annuity Benefits, we find substantial evidence supports the Board's finding that Worms was not without fault in receiving $38,105.71 in overpayment of Surviving Young Mother Annuity Benefits. 20 C.F.R. § 255.11(d)(1)(i), (d)(2). Accordingly, we affirm the Board's decision denying Worms' request for waiver of recovery of overpayment in Surviving Young Mother Annuity Benefits for the time period June 1, 1993 to July 1, 1996.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.